

**FILED**

NF

**MAY 23 2012**
May 23 2012
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

SAUSA Stephen Rotter (312) 469-6308

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HAKIMM HAMILTON;
EDDIE MOORE;
KENDRA SPICER; and
LAWRENCE JEFFRIES

**CRIMINAL COMPLAINT**

CASE NUMBER: **12 CR 386**

**UNDER SEAL**

MAGISTRATE JUDGE MASON

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: Between in or about March 2005 and in or about January 2007, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants herein,

knowingly participated in a scheme to defraud financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation, including Archer Bank, Marquette Bank, Bank Financial, and First American Bank, and to obtain monies and funds owned by and under the custody and control of the financial institutions, by means of materially false and fraudulent pretenses, representations, and promises:

### COUNT ONE

On or about April 27, 2006, in Chicago, Illinois, HAKIMM HAMILTON executed the above described scheme by depositing a check, numbered 11055, at Washington Mutual bank, made payable to HAKIMM HAMILTON, in the amount of $3,500.00, drawn on the account of Victim B at Archer Bank, in violation of Title 18, United States Code, Sections 1344 and 2.

### COUNT TWO

On or about December 7, 2006, in Lansing, Michigan, EDDIE MOORE executed the above described scheme by using a check, numbered 2814, made payable to Menard's, in the amount of $560.74, drawn on the account of Victim F at Marquette Bank, to purchase items, in violation of Title 18, United States Code, Sections 1344 and 2.

### COUNT THREE

On or about September 15, 2006, in Benton, Illinois, KENDRA SPICER executed the above described scheme by using a check, numbered 3261, made payable to Walmart, in the amount of $845.45, drawn on the account of Victim I at Bank Financial, to purchase items, in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT FOUR

On or about November 10, 2006, in South Haven, Michigan, LAWRENCE JEFFRIES executed the above described scheme by using a check, numbered 1590, made payable to Walmart, in the amount of $1122.62, drawn on the account of Victim A at First American Bank, to purchase items, in violation of Title 18, United States Code, Sections 1344 and 2.

I further state that I am an Inspector with the Postal Inspection Service, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
MARTIN BRICE
Special Agent, Postal Inspection Service

Sworn to before me and subscribed in my presence,

May 23, 2012                                      at    Chicago, Illinois
Date                                                     City and State

MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer                       Signature of Judicial Officer

STATE OF ILLINOIS    )
                            )
COUNTY OF COOK    )             **AFFIDAVIT**

I, Martin Brice, Inspector for the United States Postal Inspection Service in Chicago, Illinois, being duly sworn, depose and state as follows:

1. I am an Inspector with the Postal Inspection Service, and have been so employed for 21 years. My current responsibilities include the investigation of white collar crime, including mail, wire, and bank fraud. I received training at the Inspection Service Academy located in Potomac, Maryland. I am currently assigned to the External Crimes Team of the Chicago Division and have participated in numerous investigations, including bank fraud and fraudulent check writing schemes.

2. This affidavit is submitted in support of a criminal complaint alleging that HAKIMM HAMILTON, EDDIE MOORE, KENDRA SPICER, and LAWRENCE JEFRRIES have violated Title 18, United States Code, Section 1344. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging HAMILTON, MOORE, SPICER, and JEFFRIES with bank fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, interviews of witnesses and subjects of the investigation, my experience and training and the experience of other agents and officers, information from confidential sources, and review of records obtained during the course of the investigation.

## Overview of the Fraud Scheme

4.  Law enforcement discovered that from in or about March 2005 through in or about January 2007, a United States Postal Service employee, "Co-Schemer A," stole boxes of checks from the Postal Facility where Co-Schemer A was employed. The boxes of checks were mailed by various financial institutions, or check printing companies as directed by the financial institutions, to account holders and were routed through the Postal Facility. The investigation revealed that after stealing the checks, Co-Schemer A typically passed them to Co-Schemer B, who then provided certain stolen checks to various individuals, including HAMILTON, MOORE, SPICER, JEFFRIES, and Cooperating Witness 1 ("CW-1"), who is further described below. HAMILTON, MOORE, SPICER, JEFFRIES, and CW-1 used the account holder checks to fraudulently purchase merchandise from various merchants by falsely posing as the legitimate account holders.

5.  Between in or about March 2005 through in or about January 2007, after receiving account holder checks from Co-Schemer B, HAMILTON, MOORE, SPICER, JEFFRIES, and CW-1, often with Co-Schemer B's assistance, obtained false identification using their photographs but the identifying information of the legitimate account holders that matched certain stolen checks. HAMILTON, MOORE, SPICER, JEFFRIES, and CW-1 presented such checks with forged signatures, along with the corresponding false identification, to various merchants in Illinois, Indiana, Wisconsin, Iowa, Michigan, Ohio, and Kentucky, purporting to be the legitimate account holders in order to fraudulently purchase merchandise. HAMILTON, MOORE, SPICER, JEFFRIES, and CW-1, with Co-Schemer B's assistance, later sold the fraudulently purchased merchandise for a profit.

2

6. Thus, by presenting forged checks with fraudulent identification to various merchants and knowing that the forged checks would eventually be presented to the financial institutions by the various merchants, and by depositing forged checks at financial institutions, HAMILTON, MOORE, SPICER, JEFFRIES, and CW-1, knowingly participated in a scheme to defraud financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation, including Archer Bank, Marquette Bank, Bank Financial, and First American Bank, and to obtain monies and funds owned by and under the custody and control of the financial institutions, by means of materially false and fraudulent pretenses, representations, and promises.

7. In addition, between in or about March 2005 through in or about January 2007, the investigation revealed that as part of this scheme:

   a. From in or about April 2005 through in or about October 2006, HAMILTON fraudulently purchased a total of approximately $124,123 in merchandise.

   b. From in or about July 2005 through in or about September 2006, MOORE fraudulently purchased a total of approximately $60,478 in merchandise.

   c. From in or about November 2005 through in or about January 2007, SPICER fraudulently purchased a total of approximately $79,596 in merchandise.

   d. From in or about June 2005 through in or about November 2006, JEFFRIES fraudulently purchased a total of approximately $17,811 in merchandise.

   e. From in or about October 2005 through in or about December 2006, CW-1 fraudulently purchased a total of approximately $43,204 in merchandise.

3

## Summary of the Evidence

**Confidential Witness**

8. Some of the information in this Affidavit was provided by a cooperating individual, Cooperating Witness 1 ("CW-1"). Background information for CW-1 is as follows:

   a. <u>CW-1:</u> CW-1 participated in the same scheme and criminal conduct as the individuals named in paragraph two of this Affidavit, but has not been charged at this time. CW-1 is currently cooperating with law enforcement officers in the hope that CW-1's cooperation will be considered in future charging decisions and lead to a reduced sentence. No promises have been made to CW-1 regarding any charging or sentencing decisions. The information provided by CW-1, which is referenced in this Affidavit, was provided under the protection of a signed proffer agreement and subsequently while testifying under oath. Information provided by CW-1 has been corroborated by further investigation, including physical evidence, interviews of other witnesses and subjects of the investigation, telephone record analysis, and fingerprint analysis.

**Information Provided by CW-1**

9. In or about November 2011, CW-1 provided the following information, in summary and in part, under oath:

   a. CW-1 stated that beginning at some point in 2004, CW-1 fraudulently used checks belonging to third parties in order to purchase merchandise at various stores, and then sold the merchandise for money.

4

b. CW-1 obtained checks of third parties (victims) from Co-Schemer B, who charged CW-1 $100 for one pad of checks, or $150 for two pads of checks.

c. JEFFRIES introduced CW-1 to the check writing scheme. CW-1 was with JEFFRIES on several occasions when JEFFRIES obtained checks and false identification from Co-Schemer B. After getting checks from Co-Schemer B, CW-1 was directed by Co-Schemer B to get a false identification document matching the identity of the account holder on the checks.

d. When CW-1 first got involved in the scheme, CW-1 paid Co-Schemer B approximately $300 for each false identification card, which Co-Schemer B obtained from Individual A.[1] CW-1 was usually with JEFFRIES when meeting with Co-Schemer B.

e. CW-1 continued to meet with Co-Schemer B to obtain checks, but later met with Individual A directly to get false identification that matched the checks. Typically, Co-Schemer B first provided CW-1 with a deposit ticket from a pad of stolen checks, which listed identifying information for the victim such as the victim's name and address. Individual A then used this identifying information on the deposit slip to

---

[1] In 2010, Individual A pled guilty to possessing document making implements and authentication features, in violation of Title 18, United States Code, Section 1028(a)(5), pursuant to an amended plea agreement. On February 5, 2010, Individual A was sentenced to 41 months' imprisonment.

In or about September 2006, when Individual A was arrested in the aforementioned case, Individual A was interviewed by Inspectors and positively identified HAMILTON, MOORE, and CW-1 as regular customers who purchased counterfeit forms of identification from Individual A. However, when Inspectors re-interviewed Individual A in approximately 2010, Individual A was unable to positively identify any of the individuals named in this complaint.

make the false identification cards. CW-1 later obtained a pad of checks from Co-Schemer B that matched the names and addresses on the false identification cards.

f.  CW-1 used the stolen checks and corresponding false identification cards at various merchants, posing as the account holders. CW-1 wrote the current date on the check, made up a phone number for the "memo" line on the check, and signed the check in the account holder's name. CW-1 purchased merchandise that CW-1 believed would be easy to later sell.

g.  At first, CW-1 often brought merchandise purchased with the stolen checks to Co-Schemer B, who paid CW-1 approximately $500 for approximately $1500 worth of goods. After the first few fraudulent purchases, CW-1 sold the merchandise with Co-Schemer B and received more money.

h.  JEFFRIES was with CW-1 at least two to three times when CW-1 wrote false checks; they went to states outside of Illinois because JEFFRIES told CW-1 that there was less of a chance of getting caught with a fraudulent Illinois identification card at stores outside of Illinois.

i.  According to CW-1, CW-1 wrote stolen checks from at least six account holders. CW-1 confirmed that it was CW-1's photo on at least two fraudulent Illinois identification cards, in the names of Victims S.L. and D.C., obtained from Individual A's computer files after Individual A was arrested (see footnote 1).

j.  In approximately 2006, during the time period that CW-1 was involved in the scheme, at Co-Schemer B's direction, CW-1 went to a United States Postal facility in the Chicago area, to get stolen checks from a letter carrier who worked at the

6

Postal facility. CW-1 described the physical appearance of the letter carrier, which was consistent with the physical appearance of Co-Schemer A.

k. CW-1 recalled that on that day, CW-1's car broke down at the Postal facility, and Co-Schemer B picked up both CW-1 and the letter carrier. While they were waiting for Co-Schemer B, CW-1 recalled that the letter carrier took a brown, brand-new package with a label on it out of the letter carrier's purse and pulled out a new box of checks from the package. CW-1 further recalled that the letter carrier provided the names and addresses on the checks to Co-Schemer B over the phone.

**Fingerprint Analysis of Checks**

10. During the course of this investigation, as further described below, Inspectors received original checks from various financial institutions and from various merchants, such as Meijer, Walmart, and Target that were suspected of being fraudulent. After receiving the checks, Inspectors submitted many of the checks to the United States Postal Inspection Service Forensic Laboratory Services for fingerprint analysis.

11. Inspectors requested that any latent fingerprints found on the checks be compared with the Automated Fingerprint Identification System database. In some instances, fingerprints of suspected check writers, including the individuals named in paragraph 2 of this affidavit, were sent with the checks for analysis and comparison. In total, Inspectors sent approximately 212 checks in twelve requests for analysis between on or about August 22, 2005 and February 21, 2007. As described below, fingerprints of HAMILTON, MOORE, AND JEFFRIES were found on multiple submitted checks.

7

**LAWRENCE JEFFRIES**

Victim A

12. On or about November 16, 2006, Victim A filed a mail theft complaint with the Postal Service describing checks belonging to Victim A that had been stolen. According to the complaint, on or about November 10, 2006, Victim A was banking online with Victim A's financial institution, First American Bank, and discovered that unauthorized checks from Victim A's account were used on or about November 9, 2006.

13. Victim A's complaint further stated that on or about October 18, 2006, Victim A ordered a box of checks from First American Bank to be mailed to Victim A's residence, and that on or about October 25, 2006, a box of checks numbered 1451-1600 was put in the mail (which Victim A learned from First American Bank), but did not reach its destination. Inspectors obtained a copy of check 1590 from Victim A, which Victim A had obtained from First American Bank. Check 1590 was dated November 10, 2006, and was written to Walmart in the amount of $1122.62.

14. On or about December 4, 2006, Inspectors received the original check 1590 from Walmart along with Walmart video surveillance of the check 1590 transaction. On or about January 19, 2007, Inspectors sent check 1590, along with thirty other checks obtained during this investigation and fingerprints of JEFFRIES and others, to the forensic lab for analysis. According to a report from the forensic lab, fingerprints belonging to JEFFRIES were found on Victim A's check 1590.

15. In addition, I interviewed JEFFRIES on October 17, 2011, and determined that JEFFRIES was the same individual in the Walmart video surveillance taken on or about November 10,

8

2006, at approximately the same time that check 1590 was negotiated in Victim A's name in the amount of approximately $1122.62.

16. Inspectors received nine additional check copies from Victim A and First American Bank that according to Victim A were fraudulently used on or about November 9 and 10, 2006, at various merchants, including Walmart, Best Buy, Meijer, Kohls, and Apple. Inspectors subsequently obtained four of the original Victim A checks from Meijer for purposes of fingerprint analysis, and sent the checks to the forensic lab along with known fingerprints of JEFFRIES. According to a report from the forensic lab, fingerprints belonging to JEFFRIES were found on checks 1583, 1588, and 1589 belonging to Victim A from First American Bank.

Interview

17. On or about October 17, 2011, I interviewed JEFFRIES, who voluntarily agreed to be interviewed regarding his involvement in the check writing scheme that is the subject of this affidavit.[2] JEFFRIES admitted the following:

    a. JEFFRIES stated that JEFFRIES had fraudulently written checks from financial institution accounts in the names of various victims.

    b. When shown a binder of checks belonging to seven different victims, including Victims A and C, JEFFRIES admitted that he had written the checks.

    c. JEFFRIES had purchased all of the stolen checks from Co-Schemer B and had paid "around $100" for each pad of checks.

---

[2] On or about April 21, 2006, Jeffries pled guilty to burglary, in relation to stealing and forging checks, in the Circuit Court of Champaign County, Illinois, and was sentenced to 24 months' probation. No promises were made to JEFFRIES when he voluntarily agreed to be interviewed.

d. JEFFRIES positively identified Co-Schemer B from a six-person photo array.

e. Inspectors showed JEFFRIES several Sam's Club membership photos in the names of various victims; JEFFRIES identified MOORE, SPICER, "HAKIMM," and his own photo, where JEFFRIES was purporting to be another individual whose identity JEFFRIES used to fraudulently negotiate checks.[3]

18. During the relevant time period, JEFFRIES fraudulently purchased approximately $17,811 in merchandise from various merchants by forging checks belonging to at least seven account holders, along with corresponding false identification, to the various merchants, who accepted such checks in exchange for goods.

**HAKIMM HAMILTON**

Victim B

19. On or about May 4, 2006, according to a Justice, Illinois Police Department report, a Justice police officer was dispatched to Victim B's residence which was located in Justice, Illinois. According to the report, on or about March 24, 2006, Victim B ordered two boxes of checks from Victim B's bank, Archer Bank. According to the report, however, on or about April 4, or 5, 2006, Victim B received one box of checks in the mail instead of two boxes. According to the report, on or about May 4, 2006, Victim B went to Archer Bank to inquire

---

[3] According to the Sam's Club website, in order to make purchases at Sam's Club stores, Sam's Club requires that customers fill out a membership application, pay a nominal fee, and take a membership photograph. The application and photograph are kept on file by Sam's Club. In addition, customers are given a membership card with a card number and photo. Members are required to show their cards when entering a Sam's Club store and when checking out. Members are typically required to show an additional photo ID (e.g. driver's license) when writing personal checks.

about the missing box of checks and discovered that certain checks were cashed from Victim B's checking account, including checks 11050, 11051, 11052, 11053, 11054, 11055, 11056, 11058, 11060, 11061, 11062, 11067, 11068, and 11069. Further, according to the report, Victim B informed the police officer that approximately $10,000 in checks had been falsely negotiated.

20. According to the same police report, on or about May 15, 2006, Victim B again spoke with a Justice police officer and informed the officer that Victim B had closed Victim B's checking account at Archer Bank, and that Victim B had been contacted by a Postal Inspector.

21. According to Archer Bank records, on or about April 27, 2006, check 11055 from Victim B's Archer Bank account was deposited into a Washington Mutual bank account belonging to HAKIMM HAMILTON in the amount of approximately $3,500. The check was made payable to "Hakimm Hamilton," dated April 27, 2006, and purportedly signed in the name of Victim B. In an interview of Victim B by Inspectors, Victim B stated that Victim B did not sign or authorize anyone else to sign check 11055. Check 11055 was deposited at a Washington Mutual automated teller machine in Chicago, Illinois. Washington Mutual video surveillance taken at the time of the $3500 deposit depicts an individual resembling HAMILTON, according to Inspectors, depositing check 11055 at a Washington Mutual automated teller machine. I interviewed HAMILTON on or about February 11 and October 29, 2009, and I recognize the individual in the Washington Mutual bank surveillance photos as HAMILTON. In the surveillance photos, the individual is wearing a cap with the letter "A" in the style of the Oakland A's major league baseball team.

11

22. According to Sam's Club records, on or about April 28, 2006, a Sam's Club membership account was opened in the name of Victim B at a Sam's Club store located in Hodgkins, Illinois. According to Inspectors, the two photographs associated with Victim B's membership depict an individual resembling HAMILTON. In one of the pictures, the individual appears to be wearing the same baseball cap as the "A's" baseball cap described above. On or about February 11 and October 29, 2009, during interviews of HAMILTON, HAMILTON stated that he was the individual in the Victim B Sam's Club membership photographs.

23. According to Target Fraud Investigation records, including a point of sale transaction report, copies of checks, and store video surveillance, on or about May 1, 2006, checks 11060 and 11061 from Victim B's Archer Bank account were written to a Target store located in Davenport, Iowa, in the respective amounts of approximately $320.99 and $374.48. Each check was made payable to "Target," was dated May 1, 2006, and was signed in the name of Victim B. According to Inspectors and Target records, at approximately 6:02pm on May 1, 2011, an individual resembling HAMILTON walked into the Target store in Davenport, Iowa. According to Inspectors and Target records, the individual appears to be wearing the same baseball cap as the "A's" baseball cap described above. According to check 1060 transaction receipt, the check 11060 transaction occurred at 6:05pm. According to check 11061 transaction receipt check 11061 transaction occurred at 6:11pm .

24. According to Von Maur records, including a sale transaction report, copies of checks, and store video surveillance, on or about May 9, 2006, check 11072 from Victim B's Archer Bank account was presented to Von Maur in Davenport, Iowa, in the amount of $101.65.

According to Von Maur records, check 11072 was made payable to "Von Maur" and was signed in Victim B's name. According to Inspectors and Von Maur video surveillance, the individual conducting the check 11072 transaction appears to be HAMILTON and is wearing the same baseball cap as the "A's" baseball cap described above.

25. In addition, copies of at least six additional Victim B Archer Bank checks, that were negotiated at various merchants between on or about April 28 and May 1, 2006, were returned by Archer Bank to the merchants, and were subsequently given to Inspectors pursuant to their investigation. Inspectors determined the checks to be fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 11050 and 11076, aside from check numbered 11121, indicating they were likely from the same pad and/or box of checks.

Victim C

26. On or about November 30, 2005, Victim C's spouse filed a mail theft complaint with the Postal Inspection Service. According to the complaint, Victim C's spouse ordered checks from Victim C's financial institution, Bridgeview Bank Group, for a joint bank account owned by Victim C and Victim C's spouse. Shortly thereafter, Victim C's spouse called Bridgeview Bank Group to check on the status of the checks, which, according to the bank, were numbered 1700 to 1799. According to the complaint, Bridgeview Bank Group informed Victim C's spouse that the checks had been mailed and that checks numbered 1704 and 1706 had been presented to the bank and were pending payment. According to Victim C's spouse, Victim C's spouse then closed the joint bank account. On or about December 30, 2005, Bridgeview Bank Group sent a letter to Inspectors stating that checks 1700 to 1850

13

were missing, that there was fraudulent activity on Victim E's account, and that Victim C's

spouse closed the account on November 27, 2005.

27. According to the complaint filed by Victim C's spouse, check 1706 in the amount of $67.69

was made payable to "Murphy Gas," was signed with Victim C's name, and was dated

November 27, 2005. According to the complaint, Check 1706 was presented to Bridgeview

Bank Group, in Bridgeview, Illinois, for payment on or about November 29, 2005.

According to the complaint, Victim C received a copy of the check from Bridgeview Bank

Group and gave a copy to Inspectors for further investigation.

28. Inspectors received twelve original checks suspected of being fraudulently negotiated at

various Meijer stores from a Meijer Fraud Investigator, including Victim C Bridgeview Bank

Group checks 1704, 1709, 1719, and 1734. Inspectors sent the twelve checks to the forensic

lab for analysis. According to a report from the forensic lab, fingerprints belonging to

HAMILTON were found on Victim C check 1734, which was dated December 3, 2005,

made payable to "Meijers" in the amount of $284.99, and signed with Victim C's name.

29. On or about November 29, 2005, Victim C's spouse filled out an Inspection Service

Checking and Savings Account Questionnaire. On the questionnaire, Victim C's spouse

checked a box stating that the Nature of Complaint was "Fraud - Stolen or Lost Checks."

Further, Victim C's spouse stated that a check order placed by Victim C's spouse was never

received and that the police and Bridgeview Bank Group were notified.

30. On or about November 28, 2005, according to Sam's Club records, a Sam's Club

membership account was opened in the name of Victim C at a Sam's Club store located in

Davenport, Iowa. On the same date, check 1711 was written from Victim C's Bridgeview

Bank Group account payable to Sam's Club in the amount of approximately $1,103.31 and signed in Victim C's name. I have met with HAMILTON during the investigation and I determined that the picture on file for the Victim C Sam's Club membership account appears to be HAMILTON.

31. According to Target Fraud Investigation records, including a point of sale transaction report, copies of checks, and store video surveillance, on or about November 28, 2005, check 1712 from Victim C's Bridgeview Bank Group account was negotiated at a Target store located in Davenport, Iowa. The check was made payable to "Target" in the amount of $331.42, was dated November 28, 2005, and was signed in the name of Victim C. According to my review of Target store video, a person that appeared to be HAMILTON entered the Target store at approximately 4:25pm and left the store at approximately 4:49pm. A stamp on the back of check 1712 from the Target store register indicates that the transaction took place at approximately 4:46pm.

32. Approximately 22 Victim C bank account checks, which had been negotiated at various merchants between on or about November 27, 2005 and December 4, 2005, including those described above, were returned by Bridgeview Bank Group to the merchants. Copies of these checks were subsequently given to Inspectors as part of this investigation, who determined the checks to be fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, were numbered between approximately 1701 and 1738, indicating they were from the same pad and/or box of checks, and were included in Victim C's mail theft complaint as described in paragraph 26, above.

15

33. According to Inspectors, a review of Sam's Club membership account information, including photographs of Sam's Club members, revealed that an individual who appears to be HAMILTON is on file as the member of at least approximately twelve different Sam's Club memberships, belonging to approximately twelve different individuals, including Victims B and C, which were opened between on or about November 17, 2005 and on or about September 27, 2006.

Victim D

34. According to Meadows Credit Union records, check 7733 from Victim D's Meadows Credit Union account was presented to LaSalle National Bank, in Bridgeview, Illinois, on or about December 23, 2005, for deposit into Individual D.T.'s LaSalle National Bank account. Check 7733 was made payable to Individual D.T. in the amount of $3,500, was dated December 21, 2005, and was signed in the name of Victim D. Check 7733 was suspected of being fraudulent by LaSalle National Bank as it was presented to LaSalle National Bank after Victim D requested that Victim D's bank account be closed due to fraudulently activity.

35. Inspectors received check 7733 from LaSalle National Bank and sent it, along with ten additional checks suspected of being fraudulent,[4] to the forensic lab for analysis. According to a report from the forensic lab, fingerprints belonging to HAMILTON were found on Victim D check 7733.

---

[4] Approximately 10 checks were received by Inspectors from various merchants during the same time period that Inspectors received check 7733 from LaSalle National Bank. The approximately 10 checks were returned to the merchants by the banks as the checks belonged to victim accounts that were closed or overdrawn due to fraudulently activity.

36. From on or about December 16, 2005 through December 21, 2005, approximately eight different Victim D Meadows Credit Union checks were written from Victim D's account to various individuals each in the amount of approximately $3,500, and numbered between 7726 and 7733. On or about January 13, 2006, Victim D's spouse wrote a letter to Meadows Credit Union requesting that Meadows Credit Union release "copies of front & back of the forged checks of my closed acct" to Postal Inspectors; shortly thereafter, Inspectors received copies of Victim D checks, including those numbered 7726 through 7733. In addition, Victim D and Victim D's spouse signed Affidavit of Forgeries stating that checks 7726 and 7727 were not written by them and that they were forged checks.

37. In addition, approximately twelve different Victim D checks negotiated at various merchants between on or about December 31, 2005 and January 8, 2006, were returned by Meadows Credit Union to the merchants. Copies of these checks were subsequently given to Inspectors as part of this investigation, who determined the checks to be fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 7886 and 7901, indicating they were from the same pad and/or box of checks.

Interview

38. On or about February 11, 2009, I interviewed HAMILTON regarding his involvement in the check writing scheme described in this affidavit.[5] Prior to the interview, HAMILTON was

---

[5] On or about December 15, 2009, Hamilton was convicted of two counts of theft and sentenced in the St. Joseph Superior Court of St. Joseph County in the state of Indiana to two consecutive sentences of 18 months' imprisonment based upon Hamilton's fraudulent use of checks which had been forged and negotiated by Hamilton at a Target store. In addition, on or about February 12, 2009, Hamilton was convicted of forgery based upon similar conduct and sentenced

read and waived his *Miranda* rights. During the interview, HAMILTON admitted the following, in summary and in part:

a. HAMILTON admitted that he falsely cashed checks under various names.

b. HAMILTON started participating in the scheme in 2005. HAMILTON stated that in the beginning, HAMILTON drove the car for MOORE, and others, while they went on shopping trips. HAMILTON stated that he watched how MOORE, and others, obtained counterfeit driver's licenses to match the names on the stolen checks.

c. HAMILTON stated that a female postal employee was stealing the checks from work and selling them for approximately $150 per box.

d. HAMILTON stated that EDDIE MOORE got him involved in the scheme along with the Postal employee's boyfriend, who HAMILTON identified by first name.

e. HAMILTON stated that he and MOORE purchased their counterfeit identification from Individual A.

f. HAMILTON stated that he and MOORE purchased merchandise that could easily be sold on the streets for half price, they shopped at stores outside of Chicago, and they typically went out together for a week at a time. HAMILTON estimated that he had approximately $60,000 in cash inside his house at one point from fraudulently cashing checks, but that he spent it quickly.

g. HAMILTON positively identified himself, MOORE, and SPICER from Sam's Club photographs that are linked to third parties' identities.

---

by the Circuit Court of Champaign County in Champaign, Illinois to three years' imprisonment. No promises were made to HAMILTON when he voluntarily agreed to be interviewed.

    h. HAMILTON stated the scheme stopped because the Postal employee who was stealing the checks for them either quit or got fired.

39. On or about October 29, 2009, I conducted a follow up interview with HAMILTON, who was advised of, and waived, his Miranda rights.[6] HAMILTON was able to positively identify Co-Schemer B from a photo array, and stated that Co-Schemer B was the individual that HAMILTON bought stolen checks from. HAMILTON further stated that Co-Schemer B was the individual that HAMILTON, SPICER, and MOORE would deal with in purchasing the stolen checks, and that Co-Schemer A stole the checks to keep Co-Schemer B happy.

40. During the relevant time period, HAMILTON fraudulently purchased approximately $124,123 in merchandise from various merchants by presenting, forging, and tendering checks belonging to at least fourteen legitimate account holders, along with related false identification, to the various merchants, who accepted such checks in exchange for goods.

**EDDIE MOORE**

Victim E

41. On or about October 1, 2005, Victim E's spouse filed a mail theft complaint with the Postal Service and reported that two boxes of personal checks that Victim E's spouse had ordered were never delivered. On the same date, Victim E's spouse filed an incident report with the Bridgeview Police Department. According to the report, Victim E's spouse ordered checks from Victim E's financial institution, Cole Taylor Bank, for a joint bank account owned by Victim E and Victim E's spouse. The report further states that Victim E's spouse, on or

---

[6] No promises were made to HAMILTON when he voluntarily agreed to be interviewed.

about October 1, 2005, was checking their Cole Taylor Bank account online, and discovered that unknown person(s) wrote three checks from their account on or about September 28, 2005, including checks 2503, 2504, and 2505.

42. Victim E and/or Victim E's spouse obtained copies of checks 2503, 2504, and 2505 and gave the copies to Inspectors. In addition, for checks 2503, 2504, and 2505, Victim E swore under oath pursuant to a Cole Taylor Bank Forged Maker's Signature Affidavit that Victim E did not sign these checks, authorize anyone else to sign his name on these checks, did not receive the proceeds for these checks, and that the signatures appearing on these checks were forgeries. Inspectors discovered, through copies of the checks and contact with the merchants, the following:

    a. Check 2503 was negotiated at a Macy's store located in Indianapolis, Indiana. The check was made payable to "Macy's" in the amount of $366.96, was dated September 28, 2005, and was signed in the name of Victim E.

    b. Check 2504 was negotiated at a Von Maur store located in Indianapolis, Indiana. The check was made payable to "Von Maur" in the amount of $277.72, was dated September 28, 2005, and was signed in the name of Victim E.

    c. Check 2505 was negotiated at a Target store located in Indianapolis, Indiana. The check was made payable to "Target" in the amount of $266.18, was dated September 28, 2005, and was signed in the name of Victim E.

43. Inspectors received six original Victim E checks: checks 2515 and 2517 from Target; check 2523 from Kroger; and checks 2501, 2502, and 2506 from Meijer. Further, Meijer provided video surveillance taken at the time that check 2501 was negotiated. According to

Inspectors, an individual resembling MOORE appeared to negotiate the check.[7] Inspectors sent the six Victim E checks to the forensic lab for analysis. According to the forensic lab, fingerprints belonging to MOORE were found on Victim E checks 2501, 2502, 2506, 2517, and 2523. Checks 2501, 2502, and 2506 were made payable to "Meijer," dated September 28, 2005, and signed in Victim E's name. The checks were written in the respective amounts of $46.41, $78.42, and $369.83. Check 2517 was made payable to "Target," dated September 30, 2005, signed in Victim E's name, and written in the amount of $277.44. Check 2523 was made payable to "Kroger," dated October 2, 2005, signed in Victim E's name, and written in the amount of $79.44.

44. In addition, Inspectors sent 63 original checks to the forensic lab for analysis, including Victim E checks 2518, 2519, and 2520, which were obtained from K-Mart as part of this investigation. According to the forensic lab, fingerprints belonging to MOORE were found on Victim E checks 2519 and 2520. The checks were both made payable to "K-Mart," dated October 2, 2005, and signed in Victim E's name. The checks were written in the amounts of $296.77 and $340.23, respectively.

45. On or about September 29, 2005, according to Sam's Club records, a Sam's Club membership account was opened in the name of Victim E at a Sam's Club store located in Indianapolis, Indiana. On the same date, Sam's Club received check 2512, written from Victim E's Cole Taylor Bank account to Sam's Club, in the amount of approximately $806.23. I determined that Victim E's Sam's Club membership photograph appears to be

---

[7] Inspectors compared the individual on the video surveillance with Moore's driver's license pictures from the Illinois Secretary of State records.

MOORE based on MOORE'S driver's license picture obtained from the Illinois Secretary of State. Inspectors received video surveillance from Sam's Club taken from the store during the time period that check 2512 was negotiated. I determined that the surveillance shows an individual that appears to be MOORE entering the store on September 29, 2005, at approximately 3:57 pm, and exiting store at approximately 4:06 pm with a grocery cart containing a television. According to the receipt from the check 2512 transaction received from Sam's Club, a television was purchased with check 2512 on the same day at approximately 4:02 pm.

46. In addition, a total of at least approximately 20 Victim E Cole Taylor Bank checks that were negotiated at various merchants, including Meijer, Macy's, Target, Sam's Club, and K-Mart, between on or about September 28 through October 5, 2006, were returned by Cole Taylor Bank to the merchants. These checks totaled approximately $4,306.74. Inspectors determined the checks to be fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 2501 and 2534, indicating they were likely from the same pad and/or box of checks.

Victim F

47. On or about December 14, 2006, Victim F filed an Incident Report with the Oak Lawn Police Department and reported that on or about November 28, 2006, Victim F had ordered new personal checks from Marquette Bank for Victim F and Victim F's spouse joint bank account. The report states that Victim F never received the checks and soon discovered that five missing checks had posted against their account, totaling approximately $6,400 in

withdrawals. According to the report, Victim F gave copies of the five checks to the Oak Lawn Police Department, which were attached to the report. According to the report, Victim F also informed the police that it appeared there were at least three additional checks that had been negotiated from Victim F's account, but had not yet cleared.

48. Inspectors received original Victim F check 2814 from Menard's, which had been negotiated at a Menard's store in Lansing, Michigan on or about December 7, 2006. The check was made payable to "Menards," was dated December 7, 2006, was in the amount of $560.74, and was signed with Victim F's name. In addition, Menard's provided video surveillance taken at the time that check 2814 was negotiated, and I determined that the video surveillance shows an individual that appears to be MOORE. Inspectors sent check 2814, along with approximately 30 other checks determined to be fraudulent and obtained from various merchants and financial institutions, to the forensic lab for analysis. According to the forensic lab, fingerprints belonging to MOORE were found on check 2814.

49. According to the forensic lab, fingerprints belonging to MOORE were found on two additional Victim F checks. The checks were both written on or about December 7, 2006, from Victim F's Marquette Bank account to Meijer in the amounts of approximately $563.98 and $543.68.

50. In addition, approximately six Victim F Marquette Bank checks that were negotiated at various merchants, including Meijer, Menards, Sam's Club, and Best Buy, on or about December 7, 2006, were returned to the merchants by Marquette Bank. The checks totaled approximately $6,967.05. Copies of the checks were sent to Inspectors as part of this investigation. Inspectors determined the checks to be fraudulently written as all appeared to

have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 2812 and 2818, indicating they were likely from the same pad and/or box of checks.

Victim G

51. On or about August 9, 2006, Inspectors spoke to Victim G, who stated that on or about July 11, 2006, Victim G ordered three boxes of checks from LaSalle Bank, but only received one box of checks. According to Von Maur fraud investigators, a Victim G check was used at a Von Maur store in Louisville, Kentucky. Specifically, on or about July 27, 2006, check 2455 from Victim G's LaSalle Bank account was negotiated at a Von Maur store located in Louisville, Kentucky, in the amount of $648.56. Check 2455 was made payable to "Von Maur," was dated July 27, 2006, and was signed in the name of Victim G. Inspectors obtained store video surveillance from Von Maur during the time of the check 2455 transaction, and I determined that an individual that appears to be MOORE negotiated check 2455. Inspectors thereafter obtained the original check 2455 from Von Maur. On or about August 9, 2006 and February 14, 2012, Inspectors spoke with Victim G. Victim G stated that during the time period that Victim G discovered checks had been stolen and written from Victim G's LaSalle Bank account, Victim G filed a police report with Oak Lawn police regarding the stolen checks. Victim G stated that s/he did not authorize anyone else to write checks from Victim G's account and s/he did not sign or authorize anyone else to sign check 2455.

24

52. Inspectors sent check 2455, along with approximately 30 additional original checks obtained from various merchants, to the forensic lab for analysis. According to the forensic lab, fingerprints belonging to MOORE were found on check 2455 belonging to Victim G.

53. In addition, as further described below, it appears that SPICER was with MOORE on July 27, 2006, during the time of the Von Maur transaction. Specifically, a fraudulent check in the name of Victim H was negotiated at the same Von Maur store approximately ten minutes prior to Moore's check 2455 transaction. I determined that Von Maur store video captured an individual resembling SPICER conducting this Victim H transaction.

54. Two days later, on or about July 29, 2006, individuals that I determined to be SPICER and MOORE were captured on store video surveillance at a Von Maur located in Lombard, Illinois. According to Von Maur fraud investigators, a review of receipts and merchandise, and a review of video surveillance, it appears that SPICER and MOORE returned some of the merchandise that they had previously fraudulently purchased using checks belonging to Victims G and H, as described in paragraphs 51, 52, and 58, at the Louisville, Kentucky Von Maur store. SPICER and MOORE were issued a Von Maur gift card in the amount of $473.82 in exchange for the merchandise they returned. I determined that the video surveillance taken July 29, 2006, at Von Maur depicts both SPICER and MOORE walking around the store and receiving a gift card in exchange for the merchandise they fraudulently returned.

55. The investigation revealed that during the relevant time period, MOORE fraudulently purchased approximately $60,500 in merchandise from various merchants by forging checks

25

belonging to at least thirteen legitimate account holders, along with related false

identification, to the various merchants, who accepted such checks in exchange for goods.

## KENDRA SPICER

Victim H

56. As part of the investigation, Inspectors identified a female subject in several photographs and

surveillance videos with MOORE and HAMILTON from various merchants while

conducting transactions believed to be fraudulent. During Hamilton's February 11, 2009,

interview, as described in paragraph 38, HAMILTON identified a picture of SPICER taken

from a fraudulent Sam's Club membership. I met SPICER on March 17, 2011, during the

course of this investigation, and have seen SPICER'S driver's license photograph from the

Illinois Secretary of State, and I determined that the Sam's Club picture appeared to be

SPICER.

57. On or about August 2, 2006, Victim H filed a mail theft complaint with the Postal Service.

According to the complaint, Victim H ordered a box of checks from LaSalle Bank which she

never received. The complaint further states that LaSalle Bank contacted Victim H on or

about July 31, 2006 to notify Victim H that check 1476 had been negotiated at a Walmart

store, and, further, that the box of checks that were sent to Victim H started with check 1471.

In addition, a typewritten note titled, "Mail Theft and Vandalism Complaint" included with

the Victim H mail theft complaint and having Victim H's name at the top, stated, in part, "I

closed my account on July 24, 2006," and that "I subsequently learned from my bank that

someone had been using my checks to make large purchases at Sam's Club, Office Depot,

Meijer, Von Maur, Kmart, and Thornton Gas."

58. As described in paragraphs 53 and 54, above, Inspectors received information from Von Maur fraud investigators regarding Victim G and H checks that were used at a Von Maur store in Louisville, Kentucky. Von Maur representatives informed Inspectors that on or about July 27, 2006, check 1481 from Victim H's LaSalle Bank account was negotiated at a Von Maur store located in Louisville, Kentucky, in the amount of $1010.92. Check 1481 was made payable to "Von Maur," was dated July 27, 2006, and was signed in the name of Victim H. Inspectors obtained store video surveillance from Von Maur during the time of the check 1481 transaction. In addition, as previously stated, approximately 10 minutes later, the store video surveillance captures an individual that appears to be MOORE presenting Victim G check 2455. In addition, Victim H's check has the date "7/27/06" and the time "15:15" printed on the back of it. Victim G's check has the same date with the time "15:25" stamped on the back. I determined that the individual in the video surveillance appears to be SPICER.

59. On or about July 26, 2006, according to Sam's Club records, a Sam's Club membership account was opened in the name of Victim H at a Sam's Club store located in Clarksville, Indiana. I determined that Victim H's Sam's Club membership photograph appears to be SPICER. On the same date, check 1488 was written from Victim H's LaSalle Bank account to Sam's Club in the amount of $1714.75. Check 1488 was made payable to "Sam's Club," was dated July 26, 2006, and was signed in the name of Victim H.

60. In addition, approximately nine Victim H LaSalle Bank checks negotiated at various merchants on or about July 26, 2006 and July 27, 2006, were returned by LaSalle Bank to the merchants. Inspectors received copies of these checks and determined the checks to be

27

fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 1473 to 1488, indicating they were likely from the same pad and/or box of checks.

Victim I

61. On or about October 4, 2006, Inspectors received a fax from Victim I which included copies of fifteen checks that Victim I stated had been written from a box of stolen checks belonging to Victim I's account. Victim I also included information in the fax regarding two merchants where the stolen checks were negotiated, contact information for Victim I's checking account at Bank Financial, and the company that printed and mailed a box of checks belonging to Victim I.

62. On or about September 22, 2006, the check company sent a letter to Bank Financial stating that on September 8, 2006, the check company printed an order of 200 personal checks numbered 3101-3300 in the name and address of Victim I. The letter further stated that the check company sent these checks to Victim I on September 8, 2006 via Postal Service Priority Mail and used the address printed on the front of the checks as the mailing address. The checks were directed to Victim I's address in Illinois.

63. The copy of check 3261 included with Victim I's fax to Inspectors showed that check 3261 belonging to Victim I's Bank Financial account in the amount of $845.45 was payable to "Wal-mart," was dated September 15, 2006, and was signed in the name of Victim I. The check, according to Victim I's fax and a copy of the back of check 3261 was negotiated at a Walmart located in Benton, Illinois.

64. According to Walmart video surveillance, at the time of the transaction, an individual that appeared to be SPICER, based on Spicer's driver's license photograph, negotiated check 3261.

65. In addition, according to Victim I's fax, a copy of check 3264, and information received by Inspectors from Walmart, on the same day, September 15, 2006, check 3264 from Victim I's Bank Financial account in the amount of $407.97 was negotiated at a Walmart located in Salem, Illinois. Check 3264 was made payable to "Wal-mart," was dated September 15, 2006, and was signed in the name of Victim I.

66. Walmart representatives sent Inspectors video surveillance from the cash register where check 3264 was negotiated. According to Inspectors, the video surveillance shows that at the time of the transaction, an individual that appeared to be SPICER, based on Spicer's driver's license photograph, negotiated check 3264.

67. On or about September 15, 2006, according to Sam's Club records, a Sam's Club membership account was opened in the name of Victim I at a Sam's Club store located in Marion, Illinois. On the same day, check 3262 from I's Bank Financial account in the amount of $1827.69 was negotiated at the Marion, Illinois Sam's Club. Check 3262 was made payable to "Sam's Club," was dated September 15, 2006, and was signed in the name of Victim I. The photograph associated with Victim I's membership appears to be SPICER.

68. In addition, approximately 14 Victim I Bank Financial checks were negotiated at various merchants between on or about September 15, 2006 and September 24, 2006, and were returned by Bank Financial to the merchants. Copies of the checks were sent to Inspectors as part of this investigation. Inspectors determined the checks to be fraudulently written as

29

all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between approximately 3222 to 3230, and 3261 to 3273, indicating they were likely from the same pad(s) and/or box(es) of checks.

Victim J

69. On or about December 1, 2005, an Incident Report was filed by the Chicago Ridge Police Department regarding stolen checks belonging to Victim J. The report states that Victim J reported that an unknown offender had taken Victim J's checks, that Victim J had ordered the checks to be delivered by mail, and that the checks were numbered 1401-1600 from Prairie Bank.

70. On or about December 19, 2005, Inspectors sent a letter to Victim J's spouse, asking that Victim J's spouse contact Inspectors regarding theft of mail. On or about December 22, 2005, a letter was faxed to Inspectors along with the Incident Report and letter to Victim J's spouse, stating the following, in part: "In response to your letter, please be advised that check numbers 1400-1600...from [Prairie Bank] belonging to Victim J's spouse and Victim J of [address], Chicago Ridge, Illinois...were stolen prior to being received through the U.S. Postal Service."

71. Prairie Bank faxed Inspectors copies of 15 checks used from Victim J's account; checks numbered between1401-1406 were all negotiated on November 27, 2005, and checks numbered between 1441-1459 were negotiated on December 2 and 3, 2005. Check 1405 was made payable to "Wal-mart" in the amount of $420.82, was dated November 27, 2005, and was signed in Victim J's name.

72. Walmart sent Inspectors video surveillance showing the cash register area where check 1405 was negotiated. I determined that the video surveillance shows that at the time of the transaction, an individual that appears to be SPICER negotiated check 1405. In addition, the back of the check is dated "11/27/05" and time-stamped "10:13," which was the date and approximate time that check 1405 was negotiated on the Walmart store video surveillance.

73. Further, I determined that the video surveillance captured an individual that appears to be HAMILTON in the check out line behind the individual that appears to be SPICER. I also determined that the surveillance video shows the individual that appears to be HAMILTON conducting a transaction at the same cash register shortly after check 1405 was negotiated. Inspectors later discovered that the individual appearing to be HAMILTON negotiated check 1704 from Victim C's Bridgeview Bank Group account (described earlier in paragraphs 26 to 33) and that check 1704 was negotiated at the same Wal-Mart store on the same date of November 27, 2005, in the amount of $473.34 and was signed in the name of Victim C. The back of the check is dated "11/27/05" and time-stamped "10:16."

74. On or about November 27, 2005, according to Sam's Club records, a Sam's Club membership account was opened in the name of Victim J at a Sam's Club store located in Normal, Illinois. On the same date, November 27, 2005, check 1401 from Victim J's Prairie Bank account was negotiated at the Bloomington, Illinois Sam's Club. Check 1401 was made payable to "Sam's Club," was in the amount of $894.85, was dated November 27, 2005, and was signed in the name of Victim J. I have determined that the photograph associated with Victim J's membership appears to be SPICER.

31

75. In addition, approximately 17 Victim J Prairie Bank checks were negotiated at various merchants between on or about November 27, 2005 and December 3, 2005, and were returned by Prairie Bank to the merchants. Copies of the checks were sent to Inspectors as part of this investigation. Inspectors determined the checks to be fraudulently written as all appeared to have the same forged endorsements, similar annotations in the check memo lines, and were numbered between 1401 to 1407, and 1441 to 1460, indicating they were likely from the same pad(s) and/or box(es) of checks.

76. Based on the above information, there is probable cause to believe that HAKIMM HAMILTON, EDDIE MOORE, KENDRA SPICER, and LAWRENCE JEFFRIES, knowingly participated in a scheme to defraud financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation, including Archer Bank, Marquette Bank, Bank Financial, and First American Bank, and to obtain monies and funds owned by and under the custody and control of the financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

FURTHER AFFIANT SAYETH NOT

Martin Brice, Inspector
United States Postal Inspection Service

Sworn to and subscribed before me
on this __23__ day of May, 2012

Michael T. Mason
Magistrate Judge
United States District Court

32